UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

Santo LoCoco, II, individually and
on behalf of all persons similarly situated and
Sharon LoCoco

        Plaintiffs

versus

AbbVie Inc., and
Abbott Laboratories, Inc.,

        Defendants

Case No:_____

JURY TRIAL REQUESTED

## CLASS ACTION COMPLAINT

Plaintiffs, Santo LoCoco, II and Sharon LoCoco, by and through undersigned counsel, Gainsburgh, Benjamin, David, Meunier & Warshauer, LLC, by way of complaint against AbbVie Inc. and Abbott Laboratories, Inc. (hereinafter "Defendants") allege as follows upon information and belief:

## INTRODUCTION

1. This case involves the prescription drug AndroGel, which is manufactured, sold, distributed and promoted by Defendants as a testosterone replacement therapy.

2. At all times herein, Defendants were "manufacturers" under the Louisiana Product Liability Act, LSA-R.S. 9:2800.51, *et seq.* and their "product" AndroGel was defective and unreasonably dangerous.

3. Defendants, through direct-to-consumer and physician marketing, misrepresented that AndroGel is a safe and effective treatment for hypgonadism or "low testosterone," when in

1

fact the drug causes serious medical problems, including life threatening cardiac events, strokes, and thrombolytic events.

4. Consumers of AndroGel, including Santo LoCoco, II, were misled as to the drug's safety and efficacy, and as a result have suffered injuries including life-threatening cardiac events, strokes, and thrombolytic events.

## PARTIES

5. Plaintiff, Santo LoCoco, II (herein after "Plaintiff"), is a resident of Metairie, Louisiana. He brings this action individually and on behalf of other citizens of the State of Louisiana who are similarly situated, and specifically seeks certification of a class action consisting of:

> All persons within the State of Louisiana who are similarly situated, and specifically, on behalf of that class of persons defined as those citizens of the State of Louisiana who at any time have suffered, or who likely will suffer, personal injury, damage, or loss as a result of using, ingesting, or applying the drug AndroGel.

6. Plaintiff, Sharon LoCoco, is a resident of Metairie, Louisiana and at all times herein was the wife of Santo LoCoco.

7. For the following reasons, this action is appropriate for disposition as a class action, pursuant to Rule 23 of the Federal Rules of Civil Procedure:

> A. The large number of potential claimants herein can and will be adjudicated through the class action procedure more efficiently as compared to a mass joinder of individual claims;
>
> B. Common issues of law and fact pertaining to the determination of fault and to liability for damages predominate over individual issues such as quantum;

2

C.      The claims of, and issues pertaining to, Plaintiff are typical of all persons similarly situated in the class as defined above;

D.      The determination of fault and the basis for assessing damages may be adjudicated through the class action procedure without the necessity of contemporaneous trials as to amounts due individual claimants, allowing the class action procedure to be utilized to establish guidelines for either settlement or for subsequent individual trials on damage issues, if necessary;

E.      Plaintiff is suitable, and would be an adequate representative of the class;

F.      Plaintiff is represented by attorneys who are experienced in class action procedure and who can be expected to prosecute this matter for the best interests of the class members;

G.      The class action procedure is a superior vehicle to dispose of the issues and claims presented herein in an efficient manner

8.      Defendant AbbVie, Inc. is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 1 North Waukegan Road, North Chicago, Illinois 60064. It may be served with process through its registered agent, CT Corporation System, 5615 Corporate Boulevard, Suite 400B, Baton Rouge, Louisiana 70808.

9.      Defendant Abbott Laboratories, Inc. is a corporation organized and existing under the laws of the state of Delaware and with its principal place of business at 100 Abbott Park Road, Abbott Park, Illinois 60064. It may be served with process through its registered agent, CT Corporation System, 5615 Corporate Boulevard, Suite 400B, Baton Rouge, Louisiana 70808.

**JURISDICTION AND VENUE**

10. Subject matter jurisdiction is proper in this Court based on 28 U.S.C. §1332 as complete diversity of citizenship exists between the parties and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

11. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. §1332(d)(2), as the underlying cases are class actions with at least minimal diversity, and the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs.

12. Venue in this Court is proper pursuant to 28 U.S.C. §1391 in that a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District, and Defendants are subject to personal jurisdiction in this District.

**GENERAL ALLEGATIONS**

13. Plaintiff, Santo LoCoco, II was prescribed and supplied with, received and has taken and applied the prescription drug AndroGel, as tested, studied, researched, evaluated, endorsed, designed, formulated, compounded, manufactured, produced, processed assembled, inspected, distributed, marketed, labeled, promoted, packaged, advertised for sale, prescribed, sold or otherwise placed in the stream of interstate commerce by Defendants.

14. At all times herein, the Defendants were engaged in the business of, or were successors in interest to entities engaged in the business of research, licensing, designing, formulating, compounding, testing, manufacturing, producing, processing, assembling, inspecting, distributing, marketing, labeling, promoting, packaging and/or advertising for sale or

selling the prescription drug AndroGel for use and application by Plaintiff, and those similarly situated.

15. Hypogonadism is a specific condition of the sex glands, which in men may involve the diminished production or nonproduction of testosterone.

16. In 1999, when Unimed Pharmaceuticals Inc., one of the Defendants' predecessor companies, asked for FDA approval of AndroGel, it asserted that hypogonadism was estimated to affect approximately "one million American men."

17. In 2000, when the FDA approved AndroGel, the company announced that the market was "four to five million American men." By 2003, the number increased to "up to 20 million men." However, a study published in the Journal of American Medical Association ("JAMA") in August 2013 entitled "Trends in Androgen Prescribing in the United States, 2001-2011" indicated that many men who get testosterone prescriptions have no evidence of hypgonadism. For example, one third of men prescribed testosterone had a diagnosis of fatigue, and one quarter of men did not even have their testosterone levels tested before they received a testosterone prescription.

18. Defendants coordinated a massive advertising campaign designed to convince men that they suffered from low testosterone. Defendants orchestrated a national disease awareness media blitz that purported to educate male consumers about the signs of low testosterone. The marketing campaign consisted of television advertisements, promotional literature placed in healthcare providers' offices and distributed to potential AndroGel users, and online media including the unbranded website "IsItLowT.com."

19. The television advertisements suggested that various symptoms often associated with other conditions may be caused by low testosterone and encouraged men to discuss

testosterone replacement therapy with their doctors if they experienced any of the "symptoms" of low testosterone. These "symptoms" include listlessness, increased body fat, and moodiness – all general symptoms that are often a result of aging, weight gain, or lifestyle, rather than low testosterone.

20. Defendants' national education campaign included the creation and continued operation of the website www.IsItLowT.com. The website asserts that millions of otherwise healthy men experience low testosterone and encourages male visitors to "Take the 'Is it Low T' Quiz." The "Is it Low T" quiz asks men if they have experienced potential signs of low testosterone, including "Have you experienced a recent deterioration in your ability to play sports?", "Are you falling asleep after dinner?", "Are you sad and/or grumpy?", and "Do you have a lack of energy?"

21. Since the FDA approved AndroGel, Defendants have also sought to convince primary care physicians that low testosterone levels are widely under-diagnosed, and that conditions associated with normal aging could be cause by low testosterone levels.

22. While running its disease awareness campaign, Defendants promote their product AndroGel as an easy to use topical testosterone replacement therapy. Defendants contrast their product's at-home topical application with less convenient prescription testosterone injections, which require frequent doctor visits.

23. What consumers received, however, were not safe drugs, but a product which causes life-threatening problems, including strokes and heart attacks.

24. Defendants successfully created a robust and previous nonexistent market for their drug. Defendant Abbott Laboratories spent $80 million promoting AndroGel in 2012. The company also spent millions on its unbranded marketing including commercials and its websites,

www.IsItLowT.com and www.DriveForFive.com, sites which recommend that men have regular checkups with their physicians and five regular test done: including cholesterol, blood pressure, blood sugar, prostate-specific antigen, and testosterone.

25. Defendants' advertising paid off in a return of $1.4 billion in sales during the past year, making AndroGel the biggest selling androgen drug in the United States. Sales of replacement therapies have more than doubled since 2006, and are expected to triple to $5 billion by 2017, according to forecasts by Global Industry Analysts. Shannon Pettypiece, *Are Testosterone Drugs the Next Viagra?,* May 10, 2012, Bloomberg Businessweek, *available at:* http://www.businessweek.com/articles/2012-05-10/are-testosterone-drugs-the-next-viagra.

26. The marketing program sought to create the image and belief by consumers and physicians that low testosterone affected a large number of men in the United States and AndroGel is safe for human use, even though Defendants knew this to be false, and even though Defendants had no reasonable ground to believe them to be true.

27. There have been a number of studies suggesting that testosterone in men increases the risk of heart attacks and strokes.

28. In 2010, a New England Journal of Medicine Study entitled "Adverse Events Associated with Testosterone Administration" was discontinued after an exceedingly high number of men in the testosterone group suffered adverse events.

29. In November of 2013, a JAMA study was released entitled "Associated of Testosterone Therapy with Mortality, Myocardial Infarction, and Stroke in Men with Low Testosterone Level" which indicated that testosterone therapy raised the risk of death, heart attack and stroke by about 30%.

30. On January 29, 2014, a study was released in PLUS ONE entitled "Increased Risk of Non-Fatal Myocardial Infarction Following Testosterone Therapy Prescription in Men" which indicated that testosterone use doubled the risk of heart attacks in men over sixty five years old and men younger than sixty five with a previous diagnosis of heart disease.

31. The Food and Drug Administration approved AndroGel 1% on February 28, 2000 for the treatment of adult males who have low or no testosterone (AndroGel 1.62% was approved in April, 2011). After FDA approval, AndroGel was widely advertised and marketed by Defendant as a safe and effective testosterone replacement therapy.

32. AndroGel, is a hydroalcoholic gel containing testosterone in either 1% or 1.62%, applied to the chest, arms or stomach and enters the body through transdermal absorption. The AndroGel 1.62% product also contains isopropyl myristate as an ointment and ethanol for absorption enhancement.

33. Testosterone is a primary androgenic hormone responsible for normal growth, development of the male sex organs, and maintenance of secondary sex characteristics.

34. The hormone plays a role in sperm production, fat distribution, maintenance of muscle strength and mass, and sex drive.

35. In men, testosterone levels normally begin a gradual decline after the age of thirty.

36. The average testosterone levels for most men range from 300 to 1,000 nanograms per deciliter of blood. However, testosterone levels can fluctuate greatly depending on many factors, including sleep, time of day, and medication. Resultantly, many men who fall into hypgonadal range one day will have normal testosterone levels the next.

37. AndroGel may produce undesirable side effects to patients who use the drug, including but not limited to, myocardial infarction, stroke, and death.

38. In some patient populations, AndroGel use may increase the incidence of myocardial infarctions and death by over 500%.

39. In addition to the above, AndroGel has been linked to several severe and life changing medical disorders in both users and those who come into physical contact with users or the unwashed clothes of someone who applied AndroGel. Patients taking AndroGel may experience enlarged prostates and increased serum prostate-specific antigen levels.

40. Secondary exposure to AndroGel can cause side effects in others. In 2009 the FDA issued a black box warning for AndroGel prescriptions, advising patients of reported virilization in children who were secondarily exposed to the gel. Testosterone may also cause physical changes in women exposed to the drug and causes fetal damage in pregnant women who come into secondary contact with AndroGel.

41. Defendants' marketing strategy beginning in 2000 has been to aggressively market and sell their products by misleading potential users about the prevalence and symptoms of low testosterone and by failing to protect users from serious dangers that Defendants knew or should have known to result from use of its products.

42. Defendants successfully marketed AndroGel by undertaking a "disease awareness" marketing campaign. This campaign sought to create a consumer perception that low testosterone is prevalent among U.S. men and that symptoms previously associated with other physical and mental conditions, such as aging, stress, depression, and lethargy were actually attributable to "Low-T."

43. AbbVie's advertising program, sought to create the image and belief by consumers and their physicians that the use of AndroGel was a safe method of alleviating their symptoms, had few side effects and would not interfere with their daily lives, even though Defendants knew or should have known these to be false, and even though the Defendants had no reasonable grounds to believe them to be true.

44. Defendants purposefully downplayed, understated and ignored the health hazards and risks associated with using AndroGel. Defendats deceived potential AndroGel users by relaying positive information through the press, including testimonials from retired professional athletes, and manipulating hypogonadism statistics to suggest widespread disease prevalence, while downplaying known adverse and serious health effects.

45. Defendants concealed material relevant information from potential AndroGel users and minimized user and prescriber concern regarding the safety of AndroGel.

46. In particular, in the warnings Defendants give in their commercials, online and print advertisements, Defendants failed to mention any potential cardiac or stroke side effects and falsely represents that AbbVie adequately tested AndroGel for all likely side effects.

47. As a result of Defendants' advertising and marketing, and representations about its products, men in the United States pervasively seek out prescriptions for AndroGel. If Plaintiff in this action had known the risks and dangers associated with AndroGel, he would not have taken AndroGel and consequently would not have been subject to its serious side effects.

## SPECIFIC FACTUAL ALLEGATIONS

48. Plaintiff, Santo LoCoco, II, was 40 years of age when he was prescribed and used AndroGel for symptoms he attributed to low testosterone.

49. Plaintiff used AndroGel for several years, and he suffered a heart attack on or about July 25, 2013.

50. The AndroGel he used caused physical and emotional impairment which affected his personal and professional life. These impairments included, but were not limited to myocardial infarction.

51. Prior to using AndroGel Plaintiff had no history of these cardiac events.

52. Because of Defendants' deceiving and misleading advertising, Plaintiff was unaware of the serious risks of using AndroGel. It was not until July 2013 when he suffered a heart attack did Plaintiff learn that his heart attack was likely caused or contributed to by his use of AndroGel.

## **FIRST CAUSE OF ACTION - FAILURE TO WARN UNDER THE LOUISIANA PRODUCTS LIABILTIY ACT**

53. The AndroGel manufactured and/or supplied by Defendants was defective due to inadequate warnings or instructions because Defendants knew or should have known that the product created significant risks of serious bodily harm to consumers, and they failed to adequately warn consumers and/or their health care providers of such risks. The AndroGel manufactured and/or supplied by Defendants was defective due to inadequate post-marketing warnings or instructions because, after Defendants knew or should have known of the risk of serious bodily harm from the use of AndroGel, Defendants failed to provide an adequate warning to consumers and/or their health care providers of the product, knowing the product could cause serious injury.

54. As a direct and proximate result of Plaintiff's reasonably anticipated use of AndroGel as manufactured, designed, sold, supplied, marketed and/or introduced into the stream

11

of commerce by Defendants, Plaintiff suffered serious injury, harm, damages, economic and non-economic loss and will continue to suffer such harm, damages and losses in the future.

## SECOND CAUSE OF ACTION - BREACH OF IMPLIED WARRANTY

55. Prior to the time that the aforementioned products were used by the Plaintiff, Defendants impliedly warranted to Plaintiff and physicians that AndroGel was of merchantable quality and safe and fit for the use for which it was intended.

56. Plaintiff was and is unskilled in the research, design and manufacture of the products and reasonably relied entirely on the skill, judgment and implied warranty of the Defendants in using AndroGel.

57. AndroGel was neither safe for its intended use nor of merchantable quality, as warranted by Defendants, in that AndroGel has dangerous propensities when used as intended and will cause severe injuries to users.

58. As a results of the abovementioned breach of implied warranties by Defendants, Plaintiff suffered injuries and damages as alleged herein.

## THIRD CAUSE OF ACTION - BREACH OF EXPRESS WARRANTY

59. At all times mentioned, Defendants expressly represented and warranted to Plaintiff and physicians, by and through statements made by Defendants or their authorized agents or sales representatives, orally and in publications, package inserts and other written

materials intended for physicians, medical patients and the general public, that AndroGel is safe, effective, fit and proper for its intended use. Plaintiff purchased AndroGel relying upon these warranties.

60. In utilizing AndroGel, Plaintiff relied on the skill, judgment, representations, and foregoing express warranties of Defendants. These warranties and representations were false in that AndroGel is unsafe and unfit for its intended uses.

61. As a result of the abovementioned breach of express warranties by Defendants, Plaintiff suffered injuries and damages as alleged herein.

**WHEREFORE,** Plaintiff, individually, and for all members of the class prays for judgment against the Defendants as follows, as appropriate to each cause of action alleged and as appropriate to the particular standing of Plaintiff:

A. Class certification pursuant to FRCP 23(b)(3);

B. General damages in an amount that will conform to proof at time of trial;

C. Special damages in an amount within the jurisdiction of this Court and according to proof at the time of trial;

D. Loss of earnings and impaired earning capacity according to proof at the time of trial;

E. Medical expenses, past and future, according to proof at time of trial;

F. For past and future pain and suffering;

G. For past and future mental and emotional distress, according to proof;

H. Damages for loss of care, comfort, society, and companionship in an amount within the jurisdiction of this Court and according to proof;

I. For costs of suit incurred herein;

J. For pre-judgment interest as provided by law;

K. Sharon LoCoco seeks damages for loss of consortium; and

L. For such other and further relief as the Court may deem just and proper.

Dated: April 4, 2014

Respectfully Submitted,

**GAINSBURGH BENAJMIN DAVID MEUNIER & WARSHAUER, LLC**

*/s/ Walter C. Morrison*
**GERALD E. MEUNIER (Bar No. 9471)**
**WALTER C. MORRISON, IV (Bar No. 34687)**
2800 Energy Centre
1100 Poydras Street
New Orleans, Louisiana 70163
Telephone: (504) 522-2304
Facsimile: (504) 528-9973
wmorrison@gainsben.com
gmeunier@gainsben.com
*Attorneys for Plaintiffs*